# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>DONALD JOHN HEUTINK,<br><br>Appellant. | No. 78033-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br>FILED: February 18, 2020 |

APPELWICK, C.J. — Heutink appeals his conviction for felony stalking. He argues that in the stalking statute the phrase "under circumstances not amounting to a felony attempt of another crime" is an essential element of the crime.[1] He contends that his conviction must be reversed because the State failed to plead this element in the information, and failed to prove it beyond a reasonable doubt to the jury. Further, he asserts that the trial court erred in admitting impermissible hearsay testimony from Kristi.[2] He also asserts that the court erred in admitting evidence that others feared for Kristi's safety, because such evidence was irrelevant, unduly prejudicial, and improper opinion testimony. He contends that the State failed to prove beyond a reasonable doubt that Kristi's fear of injury was reasonable. Last, he argues that certain legal financial obligations should be stricken from his judgment and sentence. We affirm Heutink's conviction, but

---

[1] RCW 9A.46.110(1).
[2] We use Kristi Heutink's first name for clarity.

remand to the trial court to strike the criminal filing fee, jury demand fee, and domestic violence assessment.

## FACTS

Donald Heutink and Kristi Heutink were married for a little over 12 years and have four children together. They separated on December 2, 2015. After the separation, Kristi stayed in the family home with the children, and Heutink moved out.

Prior to dissolving their marriage, Kristi sought a protection order against Heutink. Heutink had been writing her letters and coming to the house, and would not stop calling or texting her despite Kristi asking him to stop. A few days before she obtained the order, Heutink sent Kristi a text message saying that he wanted to come to the house and pick up some items. Heutink had not lived at the house for close to a year by that time. Kristi repeatedly asked Heutink what he needed, and told him that she would have someone bring him the items. Heutink responded by saying that he was "coming to get [her]." At that point, Kristi called the police.

Before the police arrived, Kristi saw Heutink coming down her driveway. She locked all the doors and called 911. The 911 dispatcher explained to her that somebody was already on the way. Heutink then knocked on the door for a minute or two. After the police arrived, Heutink refused to leave, and Kristi eventually left the house while two sheriffs remained with him. On September 6, 2016, the trial court granted Kristi a temporary order for protection. Heutink did not comply with the order.

On November 21, 2016, Heutink and Kristi dissolved their marriage. A few weeks later, Kristi obtained another temporary order for protection against him. The order became permanent on December 29, 2016. Heutink failed to comply with the order. He continued to text, call, and e-mail Kristi, send her messages through other people, send her gifts, and go to her home. His violations resulted in a court proceeding the following March. On March 15, 2017, he was convicted of violating the order for protection.

In early spring of 2017, Kristi discovered a Christmas ornament hanging in the shop on her property. Her ornaments would usually be packed away with her Christmas items. On another occasion, Kristi was visiting Lummi Island with some friends and her kids, and noticed that Heutink was driving behind her. She discovered an application on her Google Play store called "GPS [(Global Positioning System)] Tracker." She had not installed the application, but it was linked to her cell phone.

In May 2017, Kristi moved to a new home and did not tell Heutink where she had moved. That August, while the order for protection was still in effect, Heutink showed up at her home. Kristi had been watching television with their son late at night when she heard Heutink's truck pull into the driveway. She called 911, got her gun, and stood in her kitchen with the gun. Through a window, she saw Heutink walk up to the front door. He knocked on the door for a while. Kristi heard the doorknob rattling and saw it moving. Heutink eventually left, and an officer arrived.

One evening in the summer of 2017, Kristi's dog began scratching at the door. She testified that this was not normal for her dog. When Kristi opened the door, she saw a figure between her house and her neighbor's house that started running. Her dog chased after the figure.

After these incidents at her new home, Kristi sought a restraining order against Heutink. The hearing on the order took place on September 21, 2017. At the hearing, Heutink stared at Kristi and glared at her attorney. At one point, the commissioner had to tell Heutink to stop staring at them. The commissioner entered a restraining order that protected not only Kristi but their four children. Heutink refused to sign the order, stomped out of the hearing, and slammed the door on his way out.

Less than a month later, on October 8, 2017, Kristi received a text message from a person named Levi Stuit. The text message stated that Heutink was wondering if he could see the boys, and asked where and when they should meet up so that Heutink could see them. Kristi recognized Stuit's name but did not know him. Because the restraining order prohibited any indirect contact between her and Heutink, she reported the text message to the police. Stuit turned out to be Heutink's friend and former coworker. On the day that Kristi received the text message from Stuit, he had left his phone in Heutink's car and did not have access to it. The messages had been deleted by the time Stuit got his phone back.

A few days later, on October 10, 2017, Kristi received flowers at her home with a card that said, "'Have a good day.'" The flowers arrived the day before her and Heutink were set to go to trial. Around that time, Heutink had gone into a

4

flower shop and ordered flowers for Kristi. He had refused to give his name, paid with cash, and left. Kristi's attorney also received flowers from Heutink that month.

Kristi grew more concerned after learning about an October 12, 2017 interview that Heutink had with Detective Kenneth Gates. Gates relayed to Kristi specific threats Heutink had made regarding her attorney, Patricia Woodall, and her former pastor, Chuck Kleinhesselink. During the interview, Gates tried talking to Heutink about the flowers that were sent to Kristi and Woodall. Gates testified that Heutink responded by saying, "'F*** Woodall. Is she scared?'" He also testified that, at one point, Heutink raised his voice and stated, "'Woodall should be scared.'" At the end of the interview, Gates asked Heutink if he had a solution to see his kids. Gates testified that Heutink said he did not have a solution, and then stated, "'A felony.'" Last, Gates explained that Heutink had made specific threats towards Woodall and Kleinhesselink. Heutink stated, "[Y]ou also should tell Pastor Chuck and Woodall that they're lucky I'm in here."

Later in October, Heutink mailed a letter and postcard to Kristi's father's house. The letter and postcard were addressed to their children. In November 2017, Heutink mailed another letter to Kristi's father's house. The letter, addressed to Kristi's father and stepmother, directed them to communicate certain information to Kristi. Heutink sent four more postcards to Kristi's father's house in December. He addressed the postcards individually to each of their four children.

The State charged Heutink with one count of stalking (domestic violence) and three aggravating factors for his conduct between December 2, 2015 and December 29, 2017. Over a defense objection at trial, the court allowed Kristi to

testify that, at one point, her sister relayed a "threat" she had received from Heutink. She testified that her sister had shown her a text message from Heutink's phone number that said, "I hope you all like the way things are going. I have a lot more up my sleeve, and this is going to be a long hot summer." The court also allowed Kristi to testify that, in October 2017, Jake Wiebusch (Heutink's probation officer) contacted her to express his concerns about her safety. She testified that Wiebusch told her to consider relocating with her family and gave her information about the witness protection program. At the CrR 3.5 suppression hearing before trial, Heutink objected to Kristi's testimony about Wiebusch. He did not object to the testimony at trial.

Several witnesses at trial were allowed to testify regarding their fear for Kristi's safety. First, two of Heutink's and Kristi's pastors testified that they were concerned for Kristi's safety based on Heutink's behavior. At the CrR 3.5 suppression hearing before trial, Heutink stated that he would be objecting to the pastors' testimony. At trial, he did not object to their testimony about their concern for Kristi.

Second, Pamela Englett, a pro tem commissioner for the Whatcom County Superior Court, testified at trial. During her testimony, the State asked her if she was concerned for Kristi's safety at the end of the September 21 hearing on the restraining order. Heutink objected to the question, and the court sustained the objection. The State then asked her if she had made any requests of others in the courtroom regarding Kristi. Commissioner Englett responded that she had. She

explained that she had asked a deputy to go with Kristi and her attorney to Kristi's car, because she was concerned for their safety. Heutink did not object.

A jury found Heutink guilty of felony stalking. It also returned three special verdicts. First, it found that Heutink violated the order protecting Kristi, but it was not unanimous that the stalking was connected to any of the court proceedings. Second, it found that Heutink and Kristi were members of the same family or household. Third, it found that the offense was committed "within the sight or sound of the victim's children who were under the age of 18."

The case then proceeded to the second phase of a bifurcated trial on whether the offense was part of an ongoing pattern of psychological abuse manifested by multiple incidents over a prolonged period of time. The jury found that the offense was part of such a pattern.

At sentencing, the trial court imposed an exceptional sentence of 18 months. It also noted that it would be ordering Heutink to pay "mandatory minimum legal financial obligations that go along with a conviction of this sort which will include a [deoxyribonucleic acid] sample and filing fee and victim's fund assessment." In addition to these fees, the judgment and sentence imposed a domestic violence assessment and a jury demand fee.

Heutink appeals.

## DISCUSSION

Heutink makes five arguments. First, he argues that the phrase "under circumstances not amounting to a felony attempt of another crime" in the stalking statute is an essential element of the crime. RCW 9A.46.110(1). Second, he

argues that the trial court erred in admitting impermissible hearsay testimony from Kristi. Third, he argues that the trial court erred in admitting evidence that others feared for Kristi's safety, because such evidence was irrelevant, unduly prejudicial, and improper opinion testimony. Fourth, he argues that the State failed to prove beyond a reasonable doubt that Kristi's fear of injury was reasonable. And fifth, he argues that certain legal financial obligations should be stricken from his judgment and sentence.

## I. Essential Element of Stalking

Heutink argues that the phrase "under circumstances not amounting to a felony attempt of another crime" in the stalking statute is an essential element of the crime. Id. Because the information filed by the State failed to include this language, he contends that the State's charging documents were deficient.[3] Thus, he argues that this court must reverse his conviction. He also asserts that the trial court's failure to instruct the jury on this element, and the State's failure to prove the element beyond a reasonable doubt, require reversal.[4]

Criminal defendants have a constitutional right to be informed of the nature and cause of the charges against them. U.S. CONST. amend. VI; WASH CONST. art. I, § 22. To be constitutionally adequate, a charging document must include all

---

[3] Heutink failed to raise this argument below. But, the sufficiency of a charging document may be challenged for the first time on appeal because it involves a question of constitutional due process. State v. Ward, 148 Wn.2d 803, 813, 64 P.3d 640 (2003). As a result, we consider the argument.

[4] Heutink also failed to raise this argument below. But, omitting an element of the crime charged is a manifest constitutional error under RAP 2.5(a)(3). State v. Scott, 110 Wn.2d 682, 688 n.5, 757 P.2d 429 (1988) ("Examples of 'manifest' constitutional errors in jury instructions are . . . omitting an element of the crime charged."). Therefore, we consider the argument

essential elements of the crime, both statutory and nonstatutory. State v. Kjorsvik, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991). An essential element is one whose specification is necessary to establish the very illegality of the behavior. State v. Johnson, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992). The primary purpose of the rule is to give defendants sufficient notice of the charges so that they can prepare an adequate defense. Kjorsvik, 117 Wn.2d at 101. We review challenges to the sufficiency of a charging document de novo. State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007).

Further, the State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. State v. Byrd, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995). "It is reversible error to instruct the jury in a manner that would relieve the State of this burden." Id. at 714. We review the legal sufficiency of jury instructions de novo. State v. Walker, 182 Wn.2d 463, 481, 341 P.3d 976 (2015).

Since it is the legislature that defines crimes, we first look to the relevant statute to determine the elements of the crime. State v. Gonzales-Lopez, 132 Wn. App. 622, 626, 132 P.3d 1128 (2006). Our objective is to determine and give effect to the legislature's intent by ascertaining the plain meaning of the statute. State v. Budik, 173 Wn.2d 727, 733, 272 P.3d 816 (2012). In doing so, we look to the text of the provision, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole. Id. If the statute remains susceptible to more than one reasonable interpretation, it is ambiguous, and we look to the legislative history of the statute and the circumstances surrounding its

9

enactment to determine legislative intent. Id. "Common sense informs our analysis, as we avoid absurd results in statutory interpretation." State v. Alvarado, 164 Wn.2d 556, 562, 192 P.3d 345 (2008). We review the criminal statute de novo. Budik, 173 Wn.2d at 733.

The stalking statute provides in part,

A person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime:

    (a) He or she intentionally and repeatedly harasses or repeatedly follows another person; and

    (b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and

    (c) The stalker either

    (i) Intends to frighten, intimidate, or harass the person; or

    (ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

RCW 9A.46.110(1) (emphasis added). Stalking is a gross misdemeanor crime, but is elevated to a class B felony if the stalking violates any protective order protecting the person being stalked. RCW 9A.46.110(5)(a)-(b).

Heutink argues that if there are "circumstances amounting to a felony attempt of another crime, the stalking statute plainly and unmistakably provides that the crime of stalking has not been committed." He contends that such circumstances exist here.

10

Stalking is a crime of harassment. RCW 9A.46.060(33). In passing the harassment statutes, the legislature found, "[T]he prevention of serious, personal harassment is an important government objective. Toward that end, this chapter is aimed at making unlawful the repeated invasions of a person's privacy by acts and threats which show a pattern of harassment designed to coerce, intimidate, or humiliate the victim." RCW 9A.46.010. The legislature has indicated that it intended a broad definition of the type of conduct that could constitute stalking or harassment. State v. Becklin, 163 Wn.2d 519, 527-28, 182 P.3d 944 (2008).

Heutink and the State both rely on State v. Ward, 148 Wn.2d 803, 64 P.3d 640 (2003). There, the State Supreme Court looked at similar statutory language in the context of felony violation of a no-contact order. Id. at 810. The statute at issue provided that "'[a]ny assault that is a violation of an order issued under this chapter . . . and that does not amount to assault in the first or second degree under RCW 9A.36.011 or 9A.36.021 is a class C felony.'" Id. (alterations in original) (quoting RCW 26.50.110(4)).

The petitioners argued that the provision "does not amount to assault in the first or second degree" functioned as an essential element of felony violation of a no-contact order. Id. at 811. The court disagreed. Id. at 813. First, it looked to its holding in State v. Azpitarte, 140 Wn.2d 138, 995 P.2d 31 (2000). Ward, 148 Wn.2d at 811. There, the court vacated Azpitarte's conviction because the jury may have relied on his second degree assault conviction instead of an uncharged fourth degree assault in finding him guilty of felony violation of a no-contact order. Azpitarte, 140 Wn.2d at 142. As a result, the Ward court interpreted the provision

to mean that if a defendant is charged and convicted of first or second degree assault, the statute proscribes the use of that assault to enhance a no-contact violation to a felony. 148 Wn.2d at 812.

Next, the court noted that the purpose of the provision was to elevate no-contact violations to a felony when any assault is committed. Id. The legislature did not need to increase the penalty for first or second degree assault, because both of those crimes are felonies. Id. The court also addressed what would happen if it were to interpret the language as requiring the State to disprove first or second degree assault as an essential element of the crime. Id. at 812-13. It explained, "[T]he defendant would be placed in the awkward position of arguing that his conduct amounts to a higher degree of assault than what the State has charged." Id. at 813. It noted that "[s]uch an interpretation does not advance the legislature's purpose of assuring victims of domestic violence maximum protection from abuse . . ., nor does it support the statute's intent to penalize assaultive violations of no-contact orders more severely than nonassaultive violations." Id.

Heutink argues that, unlike Ward, the "circumstances not amounting to" language in the stalking statute expresses that the crime of stalking is disfavored and should apply only in circumstances where other felony attempts do not. This is not a reasonable interpretation, because the legislature articulated a need for the crime by creating the stalking statute.

Heutink also contends that, unlike Ward, a defendant would not necessarily be placed in the position of arguing that his conduct amounts to more serious charges. For example, he states that some of his own conduct amounted to

attempted residential burglary, a class C felony, compared to his elevated stalking charge, a class B felony. But, if we were to interpret the language at issue as requiring the State to disprove felony attempts of other crimes, a defendant would still be placed in the awkward position of arguing that his conduct amounts to some other felony. Depending on whether the defendant was charged with gross misdemeanor or felony stalking, the defendant may have to argue that his conduct constitutes a more severe crime. Such an interpretation would not support the legislature's objective of preventing serious, personal harassment.

There are times when circumstances amounting to stalking may also amount to some other felony attempt, even though the elements of both crimes are not identical. Washington courts have long recognized a prosecuting attorney's charging discretion, including discretion to determine the nature and number of available charges to file. State v. Rice, 174 Wn.2d 884, 902-03, 279 P.3d 849 (2012). This discretion is part of the inherent authority granted to prosecuting attorneys as executive officers under the state constitution. Id. at 903-04. As a result, a prosecuting attorney has discretion to charge a defendant with stalking, some other felony attempt, or both.

The double jeopardy clauses of the federal and state constitutions bar multiple punishments for the same offense. State v. Kelley, 168 Wn.2d 72, 76, 226 P.3d 773 (2010). However, "[a] legislature can enact statutes imposing, in a single proceeding, cumulative punishments for the same conduct." Id. at 77. The double jeopardy clause prevents the sentencing court from prescribing greater punishment than the legislature intended. Id. "If the legislature intends to impose

13

multiple punishments, their imposition does not violate the double jeopardy clause." Id.

With these principles in mind, it is clear that the phrase "under circumstances not amounting to a felony attempt of another crime" is the legislature's way of telling us that it does not intend for circumstances amounting to both stalking and some other felony attempt to lead to punishment for both crimes. A prosecuting attorney may charge a defendant with stalking and some other felony attempt. It may also ask the jury to convict on both charges. But, a defendant cannot be punished for both crimes if the convictions are based on the same conduct.

Our interpretation is similar to the Ward court's interpretation of the statute governing felony violation of a no-contact order. As stated above, the language at issue provided that "'[a]ny assault that is a violation of an order issued under this chapter . . . and that does not amount to assault in the first or second degree under RCW 9A.36.011 or 9A.36.021 is a class C felony.'" Ward, 148 Wn.2d at 810 (alterations in original) (quoting RCW 26.50.110(4)). The State Supreme Court interpreted this language to mean that, if a defendant is charged and convicted under RCW 9A.36.011 or RCW 9A.36.021, the statute proscribed the use of that conviction to enhance a no-contact violation to a felony. Id. at 810-11. Similarly, under the stalking statute, if a defendant is charged and convicted of a felony attempt of another crime, the conduct that forms the basis of that conviction cannot also support a stalking conviction. This is not an issue here, because Heutink was charged and convicted only of felony stalking.

14

Our interpretation of the stalking statute means that the language at issue is not an essential element of the crime. It need not be pleaded or proved. Accordingly, the information and jury instructions were sufficient. The State was not required to prove the absence of circumstances amounting to a felony attempt of another crime.

Alternatively, Heutink argues that the stalking statute is void for vagueness. The party challenging a law as void for vagueness bears the burden of proving it unconstitutional. In re Det. of M.W., 185 Wn.2d 633, 661, 374 P.3d 1123 (2016). We presume the statute is constitutional. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). A statue is unconstitutionally vague if either (1) it does not define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is proscribed, or (2) it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. State v. Watson, 160 Wn.2d 1, 6, 154 P.3d 909 (2007). If a statute does not involve First Amendment rights, the vagueness challenged is to be evaluated by examining the statute as applied under the particular facts of the case. Id. We review the constitutionality of a statute de novo. Id. at 5-6.

Heutink argues that the ambiguity in the term "felony attempt" does not enable a defendant to determine whether or not specific conduct can be criminalized as stalking. Specifically, he argues that the term could be synonymous with "attempted felony," and does not depend on whether the attempt is criminalized as a felony or a misdemeanor. On the other hand, he argues that it could mean an attempted crime that qualifies as a felony under the criminal

15

attempt statute. Heutink argues next that the phrase "under circumstances not amounting to a felony attempt of another crime" leads to arbitrary enforcement. He asserts that, because of this language, the State "appears to enjoy a tremendous amount of discretion to decide whether or not to charge and pursue" stalking convictions.

The challenged portion of the stalking statute is not an essential element of the crime. Thus, any claimed ambiguity in the statute does not come into play in charging or convicting a defendant.[5] Rather, the challenged language prevents a defendant from being punished twice for the same conduct. Specifically, it prevents Heutink from being charged and convicted of both stalking and some other felony attempt crime based on his stalking conduct. It does not fail to specify what conduct is proscribed. Nor does it fail to provide an ascertainable standard of guilt.

And, the state constitution grants prosecuting attorneys broad charging discretion. Rice, 174 Wn.2d at 903-04. Heutink cites no authority that would limit this broad discretion under the stalking statute. Thus, he has failed to meet his burden to prove that the stalking statute is unconstitutionally vague.

---

[5] Heutink makes this same ambiguity argument to support his assertion that sufficient evidence does not support his stalking conviction. He contends that the evidence shows circumstances amounting to one attempted felony crime and two attempted crimes that qualify as felonies. For similar reasons, we need not address this argument. The State was not required to prove the absence of such circumstances.

II. Evidentiary Rulings

A. Hearsay

Heutink argues that the trial court erred in admitting evidence of his alleged threats by allowing Kristi to testify regarding the contents of text messages that he allegedly sent to her sister. Similarly, he argues that the court erred in allowing Kristi to testify that his probation officer, Wiebusch, contacted her to recommend that she relocate her family and join the witness protection program. He contends that this testimony constituted impermissible hearsay, was extremely prejudicial, and deprived him of his right to a fair trial.

As an initial matter, the State argues that Heutink waived any error regarding a hearsay objection to Kristi's testimony about Wiebusch. "A party may assign evidentiary error on appeal only on a specific ground made at trial." State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). Likewise, a party cannot appeal a ruling admitting evidence unless that party makes a timely and specific objection to its admission. ER 103(a)(1); State v. Avendano-Lopez, 79 Wn. App. 706, 710, 904 P.2d 324 (1995).

A different situation is presented when evidentiary rulings are made pursuant to motions in limine. State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). The purpose of a motion in limine is to avoid the requirement that counsel object to contested evidence when it is offered at trial. Id. Unless the trial court indicates that further objections at trial are required, the losing party is deemed to have a standing objection where a judge has made a final ruling. Id. But, when the court "refuses to rule, or makes only a tentative ruling subject to evidence

17

developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial." State v. Koloske, 100 Wn.2d 889, 896, 676 P.2d 456 (1984), overruled on other grounds by State v. Brown, 113 Wn.2d 520, 782 P.2d 1013 (1989).

At the CrR 3.5 hearing, Heutink objected to Kristi testifying about what Wiebusch told her. He stated, "[M]y objection to this is it's a conclusion that Mr. Wiebusch makes, and she relied on the conclusion, not anything that's related to Mr. Heutink." He explained that he was concerned that the jury would infer that Wiebusch was an expert witness. He also objected "to the nature of the conversation as it's really inflammatory to say that she should go into the witness protection . . . organization." Heutink did not object to Kristi's testimony about Wiebusch at trial.

Heutink did not raise a hearsay objection to Kristi's testimony at the CrR 3.5 hearing. As a result, he did not preserve a claim of error on that basis. While we generally will not review an unpreserved error, we will review such an error if it is of constitutional magnitude. State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). An issue of constitutional magnitude is presented if it relates to a defendant's right to confront witnesses. See State v. Koepke, 47 Wn. App. 897, 911, 738 P.2d 295 (1987) (allowing a defendant to raise an alleged evidentiary error for the first time on appeal because it may have affected his constitutional right to confront witnesses). Because Wiebusch did not testify at trial and was not available for cross-examination, we review Heutink's hearsay argument regarding Kristi's testimony about Wiebusch.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802. We review whether or not a statement was hearsay de novo. State v. Hudlow, 182 Wn. App. 266, 281, 331 P.3d 90 (2014). We review the admission of evidence under hearsay exceptions for abuse of discretion. Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 450, 191 P.3d 879 (2008).

The trial court admitted the testimony at issue based on the effect it had on Kristi as the listener, not to show her sister's or Wiebusch's state of mind. "Out-of-court statements offered to show their effect on the listener, regardless of their truth, are not hearsay." Henderson v. Tyrrell, 80 Wn. App. 592, 620, 910 P.2d 522 (1996). To be admissible on that basis, the listener's state of mind must be relevant to some material fact. Id. Kristi testified that after her sister showed her the text message from Heutink stating that it was "going to be a long hot summer," she applied for another no-contact order. She also testified that after Wiebusch suggested she join the witness protection program, she felt more scared than she already was. Accordingly, the testimony was not hearsay and the trial court properly admitted the testimony to show its effect on Kristi.[6]

---

[6] Heutink relies on State v. Parr, 93 Wn.2d 95, 606 P.2d 263 (1980), and State v. Sublett, 156 Wn. App. 160, 231 P.3d 231 (2010), aff'd, 176 Wn.2d 58, 292 P.3d 715 (2012), to support his argument. Parr and Sublett address testimony admitted under the state of mind exception to the hearsay rule. See 93 Wn.2d at 98; 156 Wn. App. at 198. Under that exception, a statement of the declarant's then existing state of mind is admissible. ER 803(a)(3). As established above, the testimony at issue was admitted to show the effect it had on Kristi as the listener. It was not hearsay, and did not need to be admitted under an exception to the hearsay rule. Therefore, Parr and Sublett do not control.

To the extent that Heutink objects to this testimony based on relevance and prejudice, there is no error. This testimony was relevant to the only disputed issue at trial: whether Kristi's fear of injury was reasonable. The evidence is strong and unfavorable, but that does not mean that it is unfair or unduly prejudicial. Heutink does not demonstrate otherwise.

### B. Opinion Testimony Improper, Irrelevant, and Prejudicial

Heutink argues next that the testimony of witnesses expressing their fear for Kristi's safety was not relevant and should not have been admitted. Specifically, he contends that Commissioner Englett's and the two pastors' testimony expressing their fear for Kristi was not probative of whether Kristi's fear of injury was reasonable. Even if the testimony was relevant, Heutink argues that it was unduly prejudicial under ER 403. Last, he asserts that the testimony constituted improper opinion testimony and invaded the role of the jury.

As an initial matter, the State argues that Heutink waived any evidentiary error by failing to object to the pastors' and Commissioner Englett's testimony when it was offered. At the CrR 3.5 hearing, Heutink objected to the pastors testifying about their opinion of Heutink. The State had not yet decided whether to call the pastors to testify. The trial court noted that the pastors' testimony as to their observed behavior of Heutink in Kristi's presence would be relevant, but that it was "very concerned" about testimony regarding what the pastors thought of Heutink and Kristi. The court did not make a definitive ruling limiting the pastors' testimony.

20

Heutink failed to object after the pastors testified that they were concerned for Kristi's safety. Because Heutink failed to object to the pastors' testimony based on relevance and prejudice before trial, and failed to renew his improper opinion objection at trial, we decline to review whether it was error to admit their testimony.

Heutink did object based on relevance when the State asked Commissioner Englett if she was concerned for Kristi's safety at the hearing on the restraining order. The trial court sustained the objection. The State then asked Commissioner Englett if she made "any requests of others in the courtroom regarding Kristi . . . when she left the courtroom." Commissioner Englett responded that she "asked the deputy to be sure and go with them out to her car" because she was concerned for Kristi's and Woodall's safety. Heutink did not object to this response. Because Heutink failed to object at all, we decline to review whether it was error to admit this testimony.

III. Sufficiency of Evidence

Heutink argues that the State failed to prove beyond a reasonable doubt that Kristi's fear of injury was reasonable.

The sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id.

21

Circumstantial and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

The trial court instructed the jury that, to convict Heutink of felony stalking, it had to find that the State proved seven elements beyond a reasonable doubt. Among those elements, the jury had to find that Kristi's fear of injury to herself, another person, or her property "was one that a reasonable person in the same situation would experience under all the circumstances."

While Heutink and Kristi were still married, he texted her that he wanted to pick up some items from their family home after not having lived there for almost a year. Kristi asked him what he needed so that she could have someone else drop off the items, and he responded by saying that he was "coming to get [her]." He showed up at the house and refused to leave after police arrived. He then failed to comply with multiple orders of protection Kristi obtained against him. He continued to text, call, and e-mail Kristi, send her messages through other people, send her gifts, and go to her home.

Kristi eventually moved to a new home and did not tell Heutink where she had moved. In August 2017, while an order for protection was in place, he showed up at Kristi's home late one night, knocked on the door, and rattled the doorknob. In September 2017, she was granted a restraining order against Heutink protecting her and their children for one year. At the hearing on the order, the commissioner had to tell Heutink to stop staring at Kristi and her attorney, Woodall. Heutink

refused to sign the order, stomped out of the hearing, and slammed the door on his way out.

Once the restraining order was in effect, Kristi received a text message from Heutink's friend Stuit. The text message stated that Heutink was wondering if he could see the boys, and asked when and where they should all meet up. On the day that the text message was sent, Stuit had left his phone in Heutink's car and did not have access to it. A few days later, Kristi received flowers at her home with a card that said, "'Have a good day.'" She received the flowers the day before she and Heutink were set to go to trial. Heutink had gone into a flower shop and ordered flowers for Kristi, but refused to give his name.

Kristi grew more concerned after learning about an interview that Heutink had with Detective Gates a few days after she received the flowers. Gates relayed to Kristi specific threats Heutink had made regarding Woodall and her former pastor, Kleinhesselink. During the interview, Heutink raised his voice and stated, "'Woodall should be scared.'" He also stated, "[Y]ou . . . should tell Pastor Chuck and Woodall that they're lucky I'm in here." At the end of October 2017 and into November and December 2017, Heutink mailed multiple letters and postcards to Kristi's father's house. One letter, addressed to Kristi's father and stepmother, directed them to communicate certain information to Kristi.

Heutink concedes that "[he] violated numerous protection orders," which "caused Kristi significant fear and intimidation." He also concedes that "[he] behaved inappropriately and had difficulty controlling his emotional responses to the end of his relationship." But, he contends that without evidence that he was

actually violent or threatened actual violence, insufficient evidence supports that Kristi's fear was reasonable. He cites no authority to support this contention.

Viewing the evidence in a light most favorable to the State, a rational trier of fact could find that Kristi's fear of injury was one that a reasonable person in the same situation would experience. Accordingly, the evidence is sufficient to support Heutink's conviction.

IV.    Legal Financial Obligations

A. Criminal Filing Fee and Jury Demand Fee

Heutink argues that the criminal filing fee and jury demand fee should be stricken from his judgment and sentence. He relies on House Bill 1783[7] and State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018). In Ramirez, the State Supreme Court held that House Bill 1783 applies prospectively to cases on appeal. 191 Wn.2d at 747. House Bill 1783 amended RCW 36.18.020(2)(h) and RCW 10.46.190 to prohibit courts from imposing the criminal filing fee and jury demand fee on indigent defendants. LAWS OF 2018, ch. 269, §§ 9, 17(2)(h).

Heutink claimed indigency and moved the trial court for an order allowing him to seek review of his judgment and sentence at public expense. He attached a declaration to the motion that stated he was "determined to be eligible for an attorney at public expense and this determination continues to be in effect." The trial court granted his motion.

---

[7] ENGROSSED SUBSTITUTE H.B. 1783, 65th Leg., Reg. Sess. (Wash. 2018) (House Bill 1783).

The State concedes that both the criminal filing fee and jury demand fee should be stricken pursuant to the trial court's order of indigency. We accept the State's concessions and remand for the trial court to strike the criminal filing fee and jury demand fee.

B. Domestic Violence Assessment

Heutink argues next that the domestic violence assessment should be stricken from his judgment and sentence. RCW 10.99.080(1) provides in part that courts "may impose a penalty assessment not to exceed one hundred dollars on any adult offender convicted of a crime involving domestic violence." (Emphasis added.)

The State concedes that the assessment should be stricken, because the trial court indicated it was going to impose only mandatory legal financial obligations. We accept the State's concession and remand for the trial court to strike the domestic violence assessment.

We affirm Heutink's conviction, but remand to the trial court to strike the criminal filing fee, jury demand fee, and domestic violence assessment.

WE CONCUR: