# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59292-4-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RACHEL CHRISTINA CLARK, | |
| Appellant. | |

PRICE, J. — Rachel C. Clark appeals her convictions related to her use of someone else's credit card.  She argues that during trial the State relied on inadmissible hearsay, which warrants a new trial.

Clark also argues that even if her convictions are affirmed, she is entitled to a resentencing for two reasons.  First, Clark contends that the trial court violated her constitutional rights when it required her to appear in an in-courtroom holding cell.  Second, she argues that the trial court erred in calculating her offender score because she was entitled to have this determined by a jury and because the State failed to prove the existence of her past convictions by a preponderance of the evidence.

We affirm Clark's convictions and sentence.

FACTS

I. BACKGROUND

On October 28, 2023, Kim Little received a new credit card from her bank. Little and Clark were friends, so Little asked Clark to help her activate the card. With Clark's assistance, Little activated her card on her phone by providing her personal information, including her e-mail, to the bank.

That night, Little and Clark attended a Halloween party together where a costume contest was being held. While at the party, Little ended up being selected for the contest. As she went on the stage for the contest, she handed her purse (which contained her new credit card) to Clark. Clark carried Little's purse for the rest of the night and did not give it back until the two of them returned to Little's home.

Later, Little received notifications from her bank stating that her e-mail, phone number, and PIN had been changed for her credit card. At that moment, Little realized that her card was missing. Little also learned from the bank notifications that there had been additional charges on her card that she had not made.

Based on these notifications, Little reported her missing card to the police, providing them with information regarding the disputed charges, including the times and dates of the transactions. With this information, the police were able to trace the credit card's activity to a nearby Walmart and to obtain store video footage from the date and time of the transaction. In the video footage, police were able to identify Clark as the person using Little's card.

Police interviewed Clark. During the interview, she admitted to using the card at Walmart but claimed that Little had given her permission to do so.

Clark was arrested and charged with one count of second degree theft, one count of second degree identity theft, one count of electronic data theft, and one count of third degree theft. The case proceeded to a jury trial.

II. LITTLE'S TESTIMONY

Little testified consistently with the above facts. She testified that two days after the Halloween party, she received a text message from her bank, after which she discovered that her credit card was missing. The State's questions to Little about the bank's text message promptly drew a hearsay objection from defense counsel, which was overruled.

> [STATE:] What message did you get from your bank?
> [LITTLE:] Stating that—
> [DEFENSE:] Objection; hearsay.
> THE COURT: Overruled.
> [LITTLE:] Stating that my e-mail and my phone number was changed. The PIN was changed.
> [STATE:] So, where did you receive the message from again? On your phone?
> [LITTLE:] Yes, from [the bank].
> [STATE:] And what was the content of that message regarding? What was the content of that message again?
> [LITTLE:] My e[-]mail and my phone number was changed, the PIN was changed on my card.

Verbatim Rep. of Proc. (VRP) at 114.

The State offered the copy of a text message Little had received from her bank into evidence. Defense counsel's hearsay objection was again overruled by the trial court.

Little then testified that she had also received e-mail notifications from her bank. When the State asked for additional details about the contents of these e-mails, the defense raised

additional hearsay objections. This time, however, the trial court sustained the objection to Little's

answer when she began to say that she was told that her card "was being used":

> [STATE:] So, when you—when you got those e[-]mails, did you receive any information about the card itself?
>
> [DEFENSE:] Objection; hearsay.
>
> [STATE:] Well, did you receive any information overall?
>
> [LITTLE:] That the card was being used.
>
> [DEFENSE:] Objection; hearsay.
>
> THE COURT: Sustained.
>
> [STATE:] From your bank—what information did you get from your bank regarding the card usage?
>
> [DEFENSE:] Objection; hearsay.

VRP at 116-17. Following this series of objections, the trial court asked counsel to approach where

they held a brief sidebar. The contents of the sidebar discussion are not included in our record.

Following the sidebar, Little testified that her bank also notified her that there were

disputed transactions that occurred on her credit card. She explained that after receiving a list of

the disputed charges, she took the information to the police.

The State then offered a copy of the e-mail containing the disputed charges. Defense

counsel again objected, arguing that this document contained hearsay. After reviewing the

contents of the document, the trial court overruled the objection and admitted a copy of the e-mail.

Neither Little's testimony nor the admitted document identified Clark as the person using the credit

card.

III. CONCLUSION OF THE TRIAL

During its closing argument, the defense set out its theory of the case. Faced with Clark's

admission during her interview with police, the defense conceded that Clark had used Little's

credit card and focused on the assertion that Clark had received Little's permission.  The defense said,

> So, basically, what this comes down to when you put all of this together, all this is that from the evidence or lack of evidence, from the testimony of Miss Little, testimony of my client, you need to essentially be able to say that you have an abiding belief that my client did not have the ability or the right or permission to use that credit card.  That's what the entire case comes down to, in a nutshell.

VRP at 229.

The defense's theory revolved around the history of Little and Clark's relationship and a falling out that had occurred.  The defense alleged that it was all a setup—Little had offered to let Clark use her credit card but then went to the police when Clark used it.

The jury convicted Clark of all four charges.

IV.  SENTENCING

While sentencing was initially scheduled for January 31, 2024, it was postponed for two weeks to provide defense counsel an opportunity to assess the State's calculation of Clark's offender score.  Defense counsel explained that they were still awaiting a judgment and sentence for one of Clark's out-of-state convictions, which they needed to ensure it was comparable to a Washington conviction.

On February 14, 2024, Clark appeared for sentencing while in a holding cell that was located inside of a Cowlitz County courtroom.  Neither Clark nor defense counsel objected to Clark's appearance in the holding cell.[1]

---

[1] Clark also appeared in a holding cell during pretrial hearings on this matter.  From our record, it does not appear that an objection was raised during any of these appearances.

The State explained that Clark had an offender score of 10 based on prior convictions, some of which were from out of state, and it recommended a standard range sentence.

Defense counsel requested a prison-based drug offender sentencing alternative (DOSA). They contended that "this would balance the Court's interest in both giving [] Clark a higher sanction, given the new conduct, as well as allowing her the opportunity for treatment while she [was] in custody, and giving her a longer term of community custody on the back end." VRP at 259. Defense counsel concluded by saying that they agreed with the State's calculation of Clark's offender score.

The trial court denied Clark's request for a prison-based DOSA and, instead, imposed a standard range sentence. The sentence was based on the State's calculation of Clark's offender score.

Clark appeals.

ANALYSIS

I. ADMISSION OF HEARSAY EVIDENCE

Clark argues that the trial court erred by admitting evidence during Little's testimony that Clark alleges was inadmissible hearsay. We disagree.

We generally review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Cecil*, 34 Wn. App. 2d 569, 586, 571 P.3d 1255 (2025). A trial court abuses its discretion if its decision was manifestly unreasonable or untenable. *Id.* We review the erroneous admission of evidence under the nonconstitutional harmless error standard. *State v. Rocha*, 21 Wn. App. 2d 26, 34, 504 P.3d 233 (2022). Under this standard, an error is harmless if there is no reasonable probability that the error materially affected the outcome of the trial. *Id.*

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial, that is offered as evidence to prove the truth of the matter asserted. ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802. We review the admission of evidence under a hearsay exception like other evidence—for an abuse of discretion. *State v. Carte*, 27 Wn. App. 2d 861, 877-78, 534 P.2d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024). However, the question of whether the statement is hearsay in the first place is reviewed de novo. *Id.* Accordingly, whether an out-of-court statement is being used for its truth or for another purpose is an independent analysis conducted by the court. *State v. Bennett*, ___ Wn.3d ___, 582 P.3d 294, 307 (2026). We do not simply adopt a party's claimed non-hearsay label " 'at face value.' " *Id.* (internal quotation marks omitted) (quoting *Smith v. Arizona*, 602 U.S. 779, 794, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024)).

An out-of-court statement that is offered to demonstrate its effect on the listener (regardless of the truth of that statement) is not hearsay. *State v. Heutink*, 12 Wn. App. 2d 336, 356-57, 458 P.3d 796, *review denied*, 195 Wn.2d 1027 (2020). While these kinds of out-of-court statements are not barred under hearsay rules, to be admissible, the listener or reader's state of mind "must be relevant to some material fact." *Id.* at 357. "The rule is often invoked to show that the hearer or reader received notice of some fact, had knowledge of some fact, or the like, though other applications are possible." 5D ELIZABETH A. TURNER & KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE § 803:10 at 454 (2025-2026 ed.).

A statement offered to show its effect on the listener can also include statements that explain "why officers investigated in a particular matter" or "why [an] investigation proceeded as it did." *Bennett* 582 P.3d at 307. For example, in *Bennett*, the defendant was charged with assault

7

for stabbing the victim in his home. *Id.* at 297. At trial, the State elicited testimony from an officer about the interview responses from the victim's daughter, who was an unavailable witness. *Id.* at 305-06. The State asked the officer about a part of the daughter's interview where she said that she "believe[ed]" the defendant assaulted her father because of his friendship with the defendant's wife. *Id.* at 305-06.

The *Bennett* court held that the statement was admissible as non-hearsay. The court rejected the defendant's argument that the statement was offered to show that he had motive to assault the victim. *Id.* at 306. Looking at the statement in context, the *Bennett* court explained that the State elicited this testimony after the defendant presented evidence suggesting that law enforcement had failed to conduct a thorough investigation. *Id.* at 306-07. And that the statement was introduced "to show why the police continued to focus solely on [the defendant] based on the information learned during the interview." *Id.* at 306. This non-hearsay purpose was further supported by the fact that when the State was arguing motive, the State never cited to or referenced the daughter's statement but instead relied on the defendant's own testimony. *Id.*

A. WHETHER THE STATEMENTS WERE INADMISSIBLE HEARSAY

Clark challenges two instances when she contends that the trial court erred by admitting hearsay statements. First, Clark challenges the evidence related to the initial text message Little received from her bank. She specifically points to Little's testimony in which she described the text message from her bank that said her e-mail, phone number, and PIN number had been changed. She also challenges the admission of a copy of the text message itself.

Second, Clark challenges statements made related to the disputed charges on Little's account. Clark identifies both Little's testimony stating that she had learned that there were

disputed charges made on her credit card and the admission into evidence of the e-mail printout of the disputed charges that Little had shown to the police.

The State responds that both instances identified by Clark were not hearsay. The State contends that this evidence was not admitted for the truth of the matters asserted but rather the evidence was admitted to show the effect on Little's state of mind and to lay the foundation for law enforcement's investigation.

Clark urges us to reject the State's position. She argues that Little's state of mind "was not relevant to the elements the prosecution had to prove." Reply Br. at 7. Clark contends that the statements' only relevance was for the hearsay purpose of being "substantive proof" that Clark had stolen Little's credit card and to "bolster" Little's credibility. Br. of Appellant at 20; Reply Br. of Appellant at 8.

We are unpersuaded that the trial court committed error in either instance identified by Clark. These statements were not offered to prove their truth—i.e., whether someone actually did change the contact information for the credit card or whether there actually were fraudulent charges on the card (or the amount of those charges). Rather, the evidence was used to explain what triggered Little to become concerned that she lost her credit card and to explain why she reported her lost card to the police.

Another, but related, non-hearsay purpose of the evidence was to lay the foundation for law enforcement's investigation into Little's credit card. Little's testimony about how she learned about potential activity on her card and that she had contacted the police set the stage for why law enforcement became involved. It provided background for how the officers began their investigation by tracing Little's card to a Walmart and obtained footage of Clark using the credit

card. All of which culminated in Clark's subsequent interview and arrest. Just like in *Bennett*, these statements served the non-hearsay purpose of showing the effect they had on Little and the later police investigation, not for their truth. *See Bennett*, 582 P.3d at 307. The trial court did not err by admitting them.[2]

B. HARMLESSNESS

Even assuming that these statements were inadmissible as hearsay, any error in admitting them was harmless. Nothing about this evidence identified Clark as the person responsible for the changing of Little's information or the unauthorized charges. And even if this evidence had been omitted from the trial, the jury still learned overwhelming incriminating evidence against Clark. For example, the jury learned that Clark had helped Little input her personal information into her phone to activate her new credit card. That same night, Clark had access to Little's credit card when she held Little's purse while Little was on stage. Three days later, Little noticed her credit card went missing. The jury also learned that law enforcement traced the use of the credit card to a Walmart, where video security footage showed Clark using the card the same day Little noticed it was missing. The jury also heard Clark's statements from her interview with law enforcement, during which Clark admitted to using the card at Walmart (but claimed that Little had allowed her to do so).

---

[2] Clark heavily relies on *State v. Rocha*, in which Division III arguably limited admission of out-of-court statements to explain why officers began investigating a particular matter because these facts are "of no consequence at trial." 21 Wn. App. 2d at 32-33. We are unpersuaded that this strict reading of *Rocha* accurately represents a correct application of the rules surrounding hearsay, especially after our Supreme Court's holding in *Bennett*. *See Bennett*, 582 P.3d at 307 ("A statement is not hearsay when offered for the purpose of showing its effect on a listener, such as why officers investigated in a particular manner.").

Especially because this admission that Clark used the credit card, the challenged evidence could not have had any significant role in the jury's finding of guilt. Because of Clark's admission, the defense's theory was that it was a setup—Little gave Clark permission to use the credit card and then called the police. As summarized by defense counsel, the trial was all about permission. *See* VRP at 229 (defense counsel explaining how "in a nutshell" the case was about whether Clark had permission to use Little's card). The evidence about bank notifications was simply irrelevant to the question of permission. There is no reasonable probability that any error materially affected the outcome of the trial. *See Rocha*, 21 Wn. App. 2d at 34.

## II. APPEARANCE FROM HOLDING CELL

Clark next argues for the first time on appeal that her due process rights were violated when she appeared in an in-court holding cell for her sentencing hearing (and during certain pretrial hearings). Citing to our Supreme Court's decision in *State v. Luthi*,[3] Clark argues that the trial court failed to engage in the individualized inquiry into the necessity of her restraint as required by our federal and state constitutions. The State responds that this claim cannot be raised for the first time on appeal because Clark has failed to show that it constituted a manifest constitutional error. We agree with the State.

We may refuse to review claims of error which were not first raised before the trial court. RAP 2.5(a). However, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). An error is manifest if the appellant shows actual prejudice. *State v. J.W.M.*, 1 Wn.3d 58, 91, 524 P.3d 596 (2023). The appellant must make a plausible

---

[3] 3 Wn.3d 249, 549 P.3d 712 (2024).

showing that the claimed error had practical and identifiable consequences. *Id.* "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the [trial] court could have corrected the error." *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).

Under this standard, the trial court's error was not manifest. As discussed above, Clark made no objection below, giving the trial court no notice of the potential error. And *Luthi* was not decided until over three months after her sentencing.[4] At the time of Clark's sentencing (and certainly during her earlier pretrial hearings), no Washington court had held that a defendant's appearance at nonjury proceedings in an in-court holding cell of the type used in Cowlitz County constituted a restraint subject to due process protections. *See Luthi*, 3 Wn.3d at 258-61. Thus, the trial court's failure to conduct an individualized determination of whether Clark's restraint was necessary was not an obvious error on the record. Given what the trial court knew "at the time" of Clark's case, it could not have corrected its error. *See O'Hara*, 167 Wn.2d at 100. Accordingly, we do not review Clark's claim.

### III. OFFENDER SCORE CALCULATION

#### A. TRIAL COURT'S AUTHORITY TO DETERMINE OFFENDER SCORE

Clark also argues that the trial court violated her constitutional rights when it imposed a standard range sentence "based on alleged criminal history." Br. of Appellant at 24. Relying on *Erlinger v. United States*, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024), she contends

---

[4] Clark was sentenced on February 14, 2024, and *Luthi* was decided on June 13, 2024. 3 Wn.3d at 249.

that she is entitled to have a jury decide whether she indeed has the prior convictions that make up her offender score and that this determination went beyond the trial court's authority.

Clark also argues that her offender score, in particular, required the trial court to conduct even more "deep analysis" and "factual determinations" because some of her prior convictions occurred out-of-state (requiring the court to do a comparability analysis) and some of her prior convictions occurred on the same date (requiring the court to determine whether they arose out of the "same criminal conduct"). Br. of Appellant at 28, 31. We disagree that Clark has demonstrated that her constitutional rights were violated.

It is well-established that the trial court has the authority to calculate a defendant's offender score based on their prior criminal history. *See State v. Witherspoon*, 180 Wn.2d 875, 892, 329 P.3d 888 (2014) ("We have repeatedly held that the right to jury determinations does not extend to the fact of prior convictions for sentencing purposes."). And, as we have previously held, *Erlinger* has no effect on this settled Washington law because its application is strictly limited to a federal statute, the federal Armed Career Criminal Act (ACCA). *See State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803 (holding that *Erlinger* did not overrule existing Washington precedent that the fact of a prior conviction can be determined by a judge), *review denied*, 3 Wn.3d 1034 (2024).

Even for the specific issues raised by Clark's criminal history (comparability and same criminal conduct), *Erlinger* remains inapplicable. In *State v. Frieday*, we specifically rejected *Erlinger*'s relevance to the process during which the trial court determines the comparability of out-of-state convictions. 33 Wn. App. 2d 719, 747, 565 P.3d 139, *review denied*, 5 Wn.3d 1006 (2025), *cert. denied*, __S. Ct.__, 2026 WL 490556 (Mem) (Feb. 23, 2026). We are also

unpersuaded that *Erlinger* has any relevance to "same criminal conduct." Separate from *Erlinger*'s sole application to the ACCA, same criminal conduct analysis would only lower, rather than increase her sentence. *See In re Pers. Restraint of Markel*, 154 Wn.2d 262, 274-75, 111 P.3d 249 (2005). Thus, Clark's arguments in reliance on *Erlinger* fails.[5]

### B. STATE'S BURDEN TO PROVE EXISTENCE OF PRIOR CONVICTIONS

Even assuming a jury finding was not required to determine her offender score, Clark also argues that the State failed to meet its burden to prove the existence of her convictions by a preponderance of the evidence. We disagree.

The State has the burden of proving the defendant's criminal history by a preponderance of the evidence for the calculation of their offender score. *State v. Cate*, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2020). A defendant may waive this burden, but the defendant must affirmatively acknowledge their criminal history—it is not enough for the defendant to fail to object to the State's offender score calculation. *Id.* at 913. And defense counsel may stipulate to their client's offender score on their behalf during the sentencing hearing. *See In re Pers. Restraint of Connick*, 144 Wn.2d 442, 449, 464, 28 P.3d 729 (2001) (defense counsel's agreement to offender score was considered equivalent to the defendant's "unchallenged acceptance" of it).

Here, the State's burden was waived by Clark's agreement to the State's calculation of her offender score. After receiving a two-week continuance of the sentencing hearing to have the

---

[5] Clark also argues that her criminal history was an "element" that increased her sentence, so the State should have provided notice of its intent to use her criminal history prior to opening statements. Br. of Appellant at 23. However, because this argument is premised on the contention that *Erlinger* changes prior Washington law regarding judges determining the "fact of a prior conviction," we reject Clark's argument that advanced notice of the State's intent to use past criminal history was required. *See Frieday*, 33 Wn. App. 2d at 747.

opportunity to review one of Clark's out-of-state convictions, Clark's defense counsel, in the context of sentencing, said that they agreed with the State's calculation. Thus, the State was relieved from its burden to prove the existence of Clark's prior convictions by a preponderance of the evidence. There was no error in the calculation of her offender score.[6]

## CONCLUSION

We affirm Clark's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

MAXA, J.

---

[6] In her reply brief, Clark appears to argue that her counsel's concession to her offender score occurred in a different case that was being sentenced during the same hearing. We read the record differently.