**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58638-0-II |
| Respondent, | |
| v. | |
| | ORDER GRANTING MOTION FOR RECONSIDERATION AND AMENDING OPINION |
| ROBERT JAMES DAGNON, | |
| Appellant. | |

The unpublished opinion in this case was filed on June 18, 2024. Upon the motion of the appellant for reconsideration, this court grants the appellant's motion and amends its opinion as follows:

The footnote at the bottom of page 6 shall be amended to read: "The jury also convicted Dagnon of driving under the influence. Dagnon does not challenge this conviction on appeal."

It is SO ORDERED.

_____
GLASGOW, J.

We concur:

_____
MAXA, J.

_____
VELJACIC, A.C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58638-0-II |
| Respondent, | |
| v. | |
| ROBERT JAMES DAGNON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Law enforcement officers arrested Robert Dagnon for driving under the influence. A judge then granted a search warrant for a blood draw. During his arrest and later at the hospital, Dagnon made threatening statements to the officers and against the judge, who later learned about the threat. A jury convicted Dagnon of three counts of harassing a criminal justice participant and one count of intimidating a judge.

After Dagnon appealed his judgment and sentence, the United States Supreme Court decided *Counterman v. Colorado*,[1] which refined the true threat standard for determining whether a threatening statement lacks First Amendment protection.

Dagnon argues in his statement of additional grounds (SAG) that *Counterman* rendered the true threat jury instruction erroneous. In his other briefing, he argues the State presented insufficient evidence to convict him and the trial court violated his right to confront witnesses

---

[1] ___ U.S. ___, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

against him. He finally argues in his SAG that he received ineffective assistance of counsel because his defense attorney did not present a voluntary intoxication defense.

We hold that the jury instructions were erroneous because they allowed the jury to convict Dagnon without finding that he had the reckless intent *Counterman* requires. We further hold that this error was not harmless beyond a reasonable doubt. But the evidence presented was sufficient to convict Dagnon of the charged crimes. We therefore reverse Dagnon's convictions for harassing criminal justice participants and intimidating a judge and we remand for a new trial.

FACTS

I. BACKGROUND

In 2021, Dagnon got in a single-car accident. Andrew Yocom, a deputy sheriff, responded to a call about the accident, but he did not see Dagnon's car when he arrived at the scene.

Shortly afterward, Yocom received a call about an incident at a nearby house. When Yocom arrived there, he saw Dagnon's parked car. Yocom looked inside the car and saw beer cans "throughout the driver's seat and passenger seat." Verbatim Rep. of Proc. (VRP) (Mar. 20, 2023) at 152. At the house, Yocom spoke with two people who said Dagnon assaulted them.

Intending to get statements from them, Yocom went to his car to retrieve a tape recorder. He then spotted Dagnon. Yocom arrested Dagnon for driving under the influence and secured him in his police car. Yocom recorded statements about the assaults before driving Dagnon to the hospital for a blood draw.

When Yocom drove Dagnon to the hospital, Dagnon headbutted and kicked the police car partition. Dagnon also swore at Yocom "throughout the entire trip." VRP (Mar. 20, 2023) at 169. Yocom sought backup, and Dagnon continually made threatening statements to the three officers

2

who were with him at the hospital. He also made statements threatening the judge who granted a search warrant for the blood draw. As a result, the State charged Dagnon with three counts of harassing a criminal justice participant and one count of intimidating a judge, among other charges.

## II. TRIAL

### A. Hearsay Testimony

The first person who alleged Dagnon assaulted them could not be located to testify and the second person passed away before Dagnon's trial. Defense counsel moved to prevent Yocom from testifying that the alleged victims said Dagnon assaulted them. Defense counsel argued that because neither person was going to testify, admission of their statements would violate Dagnon's right to confront witnesses against him.

The State responded that the trial court should allow Yocom to testify about the statements because the reported assaults were relevant to whether Yocom's fear of Dagnon was reasonable, an element of harassment of a criminal justice participant. RCW 9A.46.020(2)(b)(iii). The trial court ruled it would allow the testimony with a limiting instruction.

At trial, Yocom testified that one alleged victim said Dagnon "took some deer antlers, came within close proximity to her face, and told her that he could put [them] through her." VRP (Mar. 20, 2023) at 155. Yocom testified that the second alleged victim said Dagnon "[t]hrew him to the ground." VRP (Mar. 20, 2023) at 157.

The trial court instructed jurors that they could only consider this testimony about the alleged victims' statements "for the purpose of determining the reasonableness of any fear any deputy aware of these statements may have had." Clerk's Papers (CP) at 198.

3

B.      Testimony About Dagnon's Arrest

Yocom testified that when he first saw Dagnon, he told Dagnon to stop, but Dagnon walked toward him aggressively until Yocom pointed a taser at him. Yocom said Dagnon stumbled and swayed as he walked, smelled like alcohol, and slurred his words, which were "vulgar" and "angry." VRP (Mar. 20, 2023) at 159. After Yocom placed Dagnon under arrest, Dagnon said, "'Take these cuffs off, boy, we'll go a couple rounds.'" VRP (Mar. 20, 2023) at 165.

Yocom then testified that the following statement Dagnon made during the trip to the hospital "stuck with [him] the most:" "'I'm not going to forget you. I'll come for you. And I hope you don't have kids.'" VRP (Mar. 20, 2023) at 169. Yocom explained that the statement felt "personal" and that "[w]hen anybody mentions your kids, it's not a good feeling." *Id.* When asked whether he was afraid Dagnon would follow through with the threat, Yocom explained that he worried about people following through with such threats after being released, so he was "going to carry that fear . . . forever." VRP (Mar. 21, 2023) at 274.

Two hospital security guards and Jeff Godbey, a sergeant, helped Yocom take Dagnon from the police car into the hospital. Yocom noticed that Dagnon had urinated on himself.

C.      Testimony About the Blood Draw

Inside the hospital, Dagnon attracted attention because of his "language" and "screaming." VRP (Mar. 20, 2023) at 173. Godbey testified that Dagnon had "mood swings," and a couple of times, Dagnon "apologized for his behavior or language" before going "right back into more obscenities and threats." VRP (Mar. 20, 2023) at 224. Doug Lowrey, a deputy sheriff, testified similarly: "I could smell the overwhelming odor of intoxicants. And, again, [Dagnon's] behavior

was modified. It would go from settled and calm to very agitated and amped up and then back and forth." VRP (Mar. 20, 2023) at 245.

At various points, Dagnon told Yocom, Godbey, and Lowrey that they "would be on his list." VRP (Mar. 20, 2023) at 226. Godbey said, "[Dagnon] [d]idn't really verify what that list meant or was, but he said we would be on his list and he would find us when he got out." *Id.* Lowrey testified that at one point, Dagnon said, "'I'll find you. I'll kill you. I will take you all out.'" VRP (Mar. 20, 2023) at 243. Lowrey said that when Dagnon made these types of statements, he looked directly at each officer.

After Yocom obtained a search warrant to draw Dagnon's blood, Dagnon asked which judge signed the warrant. When Yocom gave the judge's name, Dagnon said, "'That f\*\*ker's on the list too.'" VRP (Mar. 20, 2023) at 176. The judge was later informed about Dagnon's statement.

While a phlebotomist drew Dagnon's blood, Dagnon continued yelling, swearing, and threatening two of the deputies. The officers had to restrain him. Subsequent testing showed that Dagnon had a blood alcohol content of 0.27.

The officers then took Dagnon back to Yocom's patrol car. Godbey and Lowrey tried getting Dagnon to sit in the seat where he had urinated. Dagnon responded by splashing the urine at them.

D.     Closing Arguments

During closing arguments, defense counsel acknowledged that Dagnon was intoxicated during the incident: "We know that [he] was drunk. Okay? We know that because we've seen all of the evidence." VRP (Mar. 21, 2023) at 352. Speaking from Dagnon's perspective, defense counsel added, "These officers . . . clearly, they're not going to be happy with you. They're going

to be upset. But you're upset; you're drunk." VRP (Mar. 21, 2023) at 353. Defense counsel argued that Dagnon made threatening statements for the purpose of conveying the fact that he was upset: "You're jabbing me, I'm going to jab you. . . . He's relaying to the officers that this unfair treatment of him is not going to be tolerated. He's going to go out and he's going to get back at you." VRP (Mar. 21, 2023) at 354. Defense counsel also argued that the words Dagnon used were too vague to be threats: "There's a difference between a threat to do bodily harm and a threat to put somebody on some vague list, okay? It's just not the same thing." VRP (Mar. 21, 2023) at 356.

The trial court instructed jurors that, to be a threat, a statement "must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat." CP at 192.

The jury convicted Dagnon of three counts of harassing a criminal justice participant and one count of intimidating a judge.[2]

Dagnon appeals his judgment and sentence.

## ANALYSIS

### I. JURY INSTRUCTIONS

In his statement of additional grounds for review (SAG), Dagnon argues that under *Counterman*, the jury instruction defining a true threat violated the First Amendment to the United

---

[2] The jury also convicted Dagnon of driving under the influence and two counts of third degree assault against Lowrey and Godbey. Dagnon does not challenge these convictions on appeal.

States Constitution.[3] Dagnon's argument is relevant to his convictions for felony harassment and intimidating a judge, all of which required the jury to find that Dagnon made true threats. Dagnon contends that this error was not harmless beyond a reasonable doubt.[4] We agree.

We apply *Counterman* in this case because Dagnon's appeal is not yet final. *See State v. Harris*, 154 Wn. App. 87, 92, 224 P.3d 830 (2010). A jury instruction is erroneous if it does not properly inform the jury of the applicable law. *See State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

A.      Constitutionality of Jury Instructions

The First Amendment does not protect true threats of violence. *Counterman*, 143 S. Ct. at 2113. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 2114 (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)).

Whether a statement is a true threat depends on what the statement conveys to the listener rather than on the speaker's mental state. *Id.* But in *Counterman*, the United States Supreme Court held that the First Amendment demands "a subjective mental-state requirement shielding some true threats from" criminal liability because prohibitions "on speech have the potential to chill . . . speech outside their boundaries." *Id.* Therefore, the Court held that where the State prosecutes a defendant for making a threat, it must prove the defendant made the threat recklessly: "The State

---

[3] While we typically address a defendant's statement of additional grounds last, we address this assignment of error first because it requires reversal of Dagnon's convictions for harassment and intimidating a judge. Additionally, Dagnon characterized the issue properly and counsel did not.

[4] In his statement of additional grounds, Dagnon also argues there was insufficient evidence that he made threats and that Yocom and the judge felt threatened. We address sufficiency of the evidence below.

must show that the defendant consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." *Id.* at 2111-12. In other words, the State must demonstrate that the defendant was "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis v. United States*, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)). Doing so entails "consciously [accepting] a substantial risk of inflicting serious harm." *Id.* at 2118. Still, under this test, the State need not prove that the defendant actually intended to carry out their threat. *Id.* at 2117.

Here, the jury instruction defining a true threat was erroneous.[5] The trial court instructed the jury that to be a true threat, a statement "must occur in a context or under such circumstances where *a reasonable person, in the position of the speaker*, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat." CP at 192 (emphasis added). But *Counterman* requires proof "that the defendant"—not just a reasonable person in their position—"consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." 143 S. Ct. at 2112.

---

[5] This instruction was based on a Washington pattern jury instruction that has since been revised to incorporate the rule *Counterman* announced. In defining a true "threat," the revised instruction states that "the speaker must know of and disregard a substantial risk that the statement or act would be interpreted" as "a serious expression of intention to carry out the threat." WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24 (updated Jan. 2024), https://govt.westlaw.com/wcrji/Document/Ief9980dde10d11daade1ae871d9b2cbe?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default).

B.      Constitutional Harmless Error

The "omission of the constitutionally required mens rea from the jury instructions . . . is analogous to" the omission of an element of the crime from the instructions. *State v. Schaler*, 169 Wn.2d 274, 288, 236 P.3d 858 (2010). Such an omission is thus subject to constitutional harmless error review. *Id.* Prejudice is presumed, and the State must prove that the error was harmless beyond a reasonable doubt. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013).

An omission of the required mens rea from the jury instructions "may be harmless when it is clear that the omission did not contribute to the verdict," for example, when "uncontroverted evidence" supports the omitted element. *Schaler*, 169 Wn.2d at 288. Conversely, an "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds." *Id.*

Here, when Dagnon made threatening statements, he was very drunk: he stumbled when he walked, slurred his words, urinated on himself, vacillated between yelling obscenities and apologizing for his behavior, and had a blood alcohol content of 0.27, more than three times the legal limit. Dagnon's severe intoxication supports an inference that he was incapable of *consciously* disregarding a substantial risk that his communications would be viewed as threatening violence, should a jury want to draw that inference. Because Dagnon's blood alcohol content was so high and he was intoxicated enough to urinate on himself, the jury could have found a reason to doubt that he *consciously understood* his statements could be regarded as threatening violence and delivered them anyway. Thus, the erroneous jury instruction was not harmless beyond a reasonable doubt. We reverse Dagnon's convictions for harassment and intimidating a judge and remand for a new trial on this basis.

II. Sufficiency of the Evidence

Dagnon argues that the State presented insufficient evidence of him harassing criminal justice participants and intimidating a judge. He contends that his statements to Yocom and the other officers were not specific enough to be threatening and that there was insufficient evidence of Yocom's and the judge's subjective fear, so he should not be subject to retrial on remand. We reach these arguments because, if there is insufficient evidence to support the essential elements of the crime, then the State cannot retry Dagnon on remand. We disagree with Dagnon.

A.      True Threat and Reckless Intent

As an initial matter, because we reverse based on the jury instruction that defined a true threat, we need not address whether the State presented sufficient evidence that Dagnon acted recklessly. It would not be appropriate for us to reverse based on insufficient evidence to support an element that was not at stake at the time of trial. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 728, 543 P.3d 821 (2024). We have no jury finding on recklessness because that was not the standard at the time of Dagnon's trial.

Instead, at the time of Dagnon's trial, the Supreme Court had not yet decided *Counterman*. As a result, the jury was not informed that, in order to convict Dagnon of harassment and intimidating a judge, it had to find that Dagnon "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 143 S. Ct. at 2112. It is impossible to analyze whether sufficient evidence supports a finding the jury never had to make. Thus, we do not further address Dagnon's arguments that the State presented insufficient evidence that he made a *true* threat to the law enforcement officers and the judge. On retrial, the State will

have the burden of proving beyond a reasonable doubt that Dagnon acted recklessly when he threatened them.

We address the remainder of Dagnon's arguments regarding the sufficiency of the evidence below.

B.       Other Sufficiency Claims

1. Yocom

In addition to arguing lack of sufficient evidence to prove recklessness, Dagnon also argues there was insufficient evidence to prove that his statements to Yocom were threatening at all or that the threats caused Yocom to experience subjective fear.

A defendant who contests the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016). Circumstantial evidence and direct evidence are equally reliable. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

When reviewing a claim of insufficient evidence, we do not "reweigh the evidence and substitute our judgment for that of the jury." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Rather, because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." *Id.*

A person is guilty of harassment if, without "lawful authority," they knowingly threaten to "cause bodily injury immediately or in the future to the person threatened or to any other person," and they place "the person threatened in reasonable fear that the threat will be carried out." RCW

9A.46.020(1)(a)(i), (b).[6] Harassment becomes a class C felony if "the person harasses a criminal justice participant who is performing his or her official duties at the time the threat is made." RCW 9A.46.020(2)(b)(iii). The "fear from the threat must be a fear that a reasonable criminal justice participant would have under all the circumstances." RCW 9A.46.020(2)(b).

We look at the totality of the circumstances in determining whether there was sufficient evidence that words constituted threatening statements, and we do not limit our inquiry "to a literal translation of the words spoken." *State v. Boyle*, 183 Wn. App. 1, 8, 335 P.3d 954 (2014). For example, in *Boyle*, Division One upheld a harassment conviction where the defendant told an officer he was not threatening him but kicked a patrol car door, continually made violent statements, referenced the murder of four police officers in a nearby city, and said things like, "'You wait and see what happens when I get out.'" *Id.* at 8.

There is sufficient evidence of a listener's subjective fear when the listener testifies that the threats made them feel afraid. *Trey M.*, 186 Wn.2d at 905 ("[E]ach boy testified that when he heard that he was on [the defendant's] 'hit list,' he was 'scared.' . . . That is sufficient.").

Here, there is sufficient evidence that Dagnon made statements to Yocom that were actually threatening. Dagnon told Yocom, "'I'm not going to forget you. I'll come for you. And I hope you don't have kids.'" VRP (Mar. 20, 2023) at 169. Dagnon made this statement during a car ride where he continually swore at Yocom and headbutted and kicked the partition between them. And earlier, when Yocom arrested Dagnon, Dagnon told Yocom to take off his handcuffs so they could "'go a couple rounds.'" VRP (Mar. 20, 2023) at 165. As in *Boyle*, the exact words

---

[6] We cite the current version of the statute because the relevant language has not changed.

Dagnon used were somewhat vague, but the context in which he used them permits the inference that he was, at the very least, threatening to physically harm Yocom or his family members.

There is also sufficient evidence that Dagnon's threat made Yocom experience subjective fear. Yocom said the words "stuck with [him]" because they were "personal," adding that when "anybody mentions your kids, it's not a good feeling." VRP (Mar. 20, 2023) at 169. And Yocom said he would carry his fear of Dagnon implementing the threat "forever." VRP (Mar. 21, 2023) at 274.

The State presented sufficient evidence that Dagnon used threatening language against Yocom and that Yocom experienced subjective fear. Thus, Dagnon is subject to retrial on this count on remand.

2. Other victims

To the extent Dagnon argues there was insufficient evidence that his statements to the other officers and the judge were threatening *at all*—for example, when he said he was putting them on his "list"—his argument fails. As stated above, we look at the totality of the circumstances in determining whether there was sufficient evidence that words constituted threatening statements. *Boyle*, 183 Wn. App. at 8. Here, Dagnon told the officers that they "would be on his list" and that "he would find [them] when he got out." VRP (Mar. 20, 2023) at 226. Dagnon also told the officers that he would find them and kill them. Considering these statements and Dagnon's violent behavior throughout the incident, the jury could have reasonably inferred that Dagnon meant he was putting the officers on a list of people he intended to harm in the future. For the same reasons, the jury could have reasonably interpreted Dagnon's statement that the judge was "'on the list too'" as a threat. VRP (Mar. 20, 2023) at 176.

Additionally, to the extent Dagnon argues there was insufficient evidence that his threat caused the judge to experience subjective fear, this argument fails as well. When the prosecutor asked the judge if Dagnon's statement that he "made the list" caused him concern, the judge testified, "Absolutely. . . . [Dagnon] says he keeps a list of people who pay with . . . their lives . . . And, you know, I just got added to the list. And so I was concerned." VRP (Mar. 20, 2023) at 213-14. This testimony provides sufficient evidence of the judge's subjective fear. *See Trey M.*, 186 Wn.2d at 905.

The State is free to retry all of the counts of felony harassment and intimidating a judge.

### III. CONFRONTATION CLAUSE

Dagnon argues that the trial court violated his right to confront witnesses against him when it allowed Yocom to testify that the alleged victims said Dagnon assaulted them. He contends that this constitutional error was not harmless beyond a reasonable doubt because the State had to prove that Dagnon's threats made the officers reasonably afraid and the hearsay statements were "critical to showing the reasonableness of the [officers'] fears." Appellant's Opening Br. at 29. We address this issue because it will likely recur on remand. We disagree with Dagnon.

A criminal defendant has the right to confront the witnesses against them. U.S. CONST. amend. VI. "We review confrontation clause claims de novo." *State v. Galeana Ramirez*, 7 Wn. App. 2d 277, 283, 432 P.3d 454 (2019).

The confrontation clause prohibits the admission of the "testimonial hearsay statements of a witness who does not appear" at trial unless "the witness is unavailable to testify and . . . the defendant had a prior opportunity" to cross-examine the witness. *State v. Beadle*, 173 Wn.2d 97, 107, 265 P.3d 863 (2011). In the police interrogation context, statements "'are testimonial when

14

the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 108 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)).

The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *see also State v. Moses*, 129 Wn. App. 718, 732, 119 P.3d 906 (2005) (no confrontation clause violation in a murder trial where the court admitted a non-testifying child's statement to a social worker about the defendant assaulting the child's mother because the State introduced the statement only to explain why the social worker contacted Child Protective Services).

A statement is used for a purpose other than establishing the truth of the matter asserted when it is admitted to show its effect on the listener. *State v. Heutink*, 12 Wn. App. 2d 336, 356-57, 458 P.3d 796 (2020). "To be admissible on that basis, the listener's state of mind must be relevant to some material fact." *Id.* at 357. For example, in *Heutink*, the defendant was on trial for felony stalking, and the victim testified that the defendant's probation officer told her she should join a witness protection program. *Id.* at 345, 355, 357. Division One held that the trial court properly admitted the statement to show its effect on the victim, reasoning that the statement was "relevant to the only disputed issue at trial: whether [the victim's] fear of injury was reasonable." *Id.* at 357.

Here, the trial court did not violate Dagnon's right to confront witnesses against him. The alleged victims did not appear at trial, and their statements to Yocom were testimonial because

there was no ongoing emergency when Yocom spoke with them. The primary purpose of Yocom's conversations with them was to collect evidence that Dagnon committed a crime. But the confrontation clause does not bar admission of these statements because the trial court did not admit them for the purpose of establishing their truth, namely that Dagnon threatened the one witness with deer antlers and threw the second to the ground. Rather, like the statements in *Heutink*, the trial court admitted these statements because their effect on Yocom was relevant to the reasonableness of his fear that Dagnon would injure him.

The trial court thus did not violate the confrontation clause when it allowed Yocom to testify about the statements the alleged victims made.[7]

## CONCLUSION

We reverse Dagnon's convictions for harassing criminal justice participants and intimidating a judge and remand for a new trial.

---

[7] Because we remand for a new trial based on the erroneous jury instruction defining a true threat, we do not reach Dagnon's ineffective assistance of counsel claim. Counsel will have a chance to reevaluate the strategic value of requesting a voluntary intoxication instruction in light of the change in the definition of a true threat.

No. 58638-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
MAXA, J.

_____
VELJACIC, A.C.J.